THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
DIVISON

John P. Honnigford
Petitioner

Case #:

Crim Case: **3:18-cr-00031-RLY-MPB-1**

v.

Mark Williams,
Acting Warden, FCI Elkton
Respondent

## EMERGENCY MOTION FOR EXPEDITED, INJUNCTIVE AND FOR OTHER RELIEF

Petitioner, John P. Honnigford, pro se (hereinafter "Honnigford") respectfully moves this

Court, pursuant to 28 U.S.C. § 2241, for immediate placement into home confinement based

upon the existence of "extraordinary and compelling reasons." Namely, the rapidly-expanding

COVID-19 Coronavirus threatens Honnigford's health, exposing him to unsafe living conditions.

Honnigford requests that he be permitted to finish the remaining portion of his sentence

on home confinement, consistent with the Attorney General's April 3, 2020 Memorandum which

states as follows:

> IMMEDIATELY MAXIMIZE APPROPRIATE TRANSFERS TO HOME
> CONFINEMENT OF ALL APPROPRIATE INMATES AT FCI OAKDALE,
> FCI DANBURY, FCI ELKTON, AND AT OTHER SIMILARLY SITUATED
> BOP FACILITIES WHERE COVID-19 IS MATERIALLY AFFECTING
> OPERATIONS.

1

Per the Attorney General's March 26, 2020 Memorandum, some of the factors that the

Bureau of Prisons (BOP) should consider include:

- The age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) Guidelines;
- The security level of the facility currently holding the inmate, with priority given to inmates residing in low- and minimum- security facilities;
- The inmate's conduct in prison;
- The inmate's score under PATTERN;
- Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;
- The inmate's crime of conviction and assessment of the danger posed by the inmate to the community.

Given that Honnigford currently resides in a low-security facility, Honnigford's

documented re-entry plan, and his long-standing recent pre-trial placement with the U.S. Marshal

Service, he is an ideal candidate for transfer to home confinement.

## I. INTRODUCTION

On March 11, 2020, the World Health Organization ("WHO") classified COVID-19 as a

pandemic, and on March 13, 2020, President Donald Trump declared the pandemic to constitute

a national emergency.[1]

---

[1] *See Coronavirus: COVID-19 Is Now Officially A Pandemic, WHO Says*, NPR (Mar. 11, 2020), https://www.npr.org/sections/goatsandsoda/2020/03/11/814474930/coronavirus-covid-19-is-now-officially-a- pandemic-who-says; *Trump Declares Coronavirus National Emergency, Says He Will Most Likely Be Tested*, Reuters (Mar. 13, 2020), https://www.reuters.com/article/us-health-coronavirus-usa-emergency/trump-declares- coronavirus-national-emergency-says-he-will-most-likely-be-tested-idUSKBN2102G3.

The BOP has acknowledged that the risks of the rapid transmission of contagion in the tight quarters of prisons and jails present significant challenges to keeping inmates and staff safe and healthy.[2]

Honnigford, like all people in prison, live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced. There are countless opportunities for COVID-19 to be introduced into a prison, including daily staff ingress and egress, transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from legal representatives. Lastly, inmates lack the ability to exercise disease prevention measures. Living conditions do not allow for them to care for themselves with frequent hand washing and practicing social distancing. Prison security prohibits their access to alcohol-based sanitation products, and prison rules prohibit them from wearing masks.

The first confirmed case of COVID-19 in a federal facility was reported in mid March.[3] As of April 16, 2020, the Bureau of Prisons website reports that 473 federal inmates and 279 BOP staff are known to have the Coronavirus. The first mass COVID-19 outbreak at a federal corrections facility occurred in late March, 2020 at FCI Oakdale in Western Louisiana, resulting in, at least, 30 confirmed cases.[4] FCI Oakdale also experienced the first inmate fatality from

---

[2] *See* Fed. Bureau of Prisons, Program Statement 6190.04: Infectious Disease Management (2014), *available at* https://www.bop.gov/policy/progstat/6190_004.pdf.

[3] *See First Federal Inmate Tests Positive for Coronavirus*, NYPost.com (Mar. 22, 2020), https://nypost.com/2020/03/22/first-federal-inmate-tests-positive-for-coronavirus/.
[4] *See An Explosion of coronavirus cases cripples a federal prison in Louisiana*, Washington Post.com (March 29, 2020), https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripples-a-federal-prision-in- Louisiana.

COVID-19, a 49-year-old male.[5] Unsurprisingly, the inmate suffered from "'long-term, preexisting medical conditions' that increased his risk of developing the disease."[6]

Members of the United States Senate and House of Representatives, recognizing that federal prisons are at extreme risk of becoming "epicenters of the COVID-19 pandemic," have urged the BOP and the Department of Justice (DOJ) to release vulnerable patients, specifically those "who are 50 years old and older, that make them vulnerable to COVID-19 infection."[7]

## II. STANDARD of REVIEW

### The First Step Act of 2018.

Under the First Step Act of 2018, a defendant is entitled to a reduction in the term of imprisonment if "after considering the factors outlined in section [18 U.S.C. § 3553(a)," the Court finds that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A). In granting such a reduction, the Court "may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." Id. The Court may grant this relief based on a defendant's own motion – rather than on motion from the BOP – if: (1) the defendant has fully exhausted his

---

[5] *Id.*

[6] *Id.*

[7] *See, e.g.,* Letter from U.S. Senator Kamala D. Harris to Director of the BOP (Mar. 19, 2020), *available at* https://www.harris.senate.gov/imo/media/doc/Harris%20Letter%20to%20Carvajal%20(3.19).pdf; Letter from U.S. Congresswoman Karen Bass to Attorney General William P. Barr (Mar. 19, 2020), *available at* https://judiciary.house.gov/uploadedfiles/2020-03-19_letter_to_ag_barr_re_covid19.pdf.

administrative remedies; or (2) there has been a lapse of thirty (30) days from the warden's receipt of the defendant's request. Id.

Although courts have historically looked to the commentary issued by the Sentencing Commission for guidance on the meaning of "extraordinary and compelling reasons," that commentary was written before the First Step Act and, therefore, several courts have identified an issue regarding how that term is to be defined. See U.S.S.G. § 1B1.13; see also United States v. Cantu, No. 1:05-CR-458-1, 2019 WL 2498923, at *1 n.1 (S.D. Tex. June 17, 2019) (noting that the Sentencing Commission has not amended the Guidelines following the First Step Act).

To date, the majority of district courts that have considered this issue have held that the court may exercise its discretion in determining what reasons justify granting compassionate release. See, e.g., United States v. Brown, 411 F. Supp. 3d 446, 449-50 (S.D. Iowa 2019); see also United States v. Redd, No. 1:97-CR-00006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020); United States v. Fox, No. 2:14-CR-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) ("I treat the previous BOP discretion to identify other extraordinary and compelling reasons as assigned now to the courts."); United States v. Beck, No. 1:13-CR-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether "extraordinary and compelling reasons" warrant a sentence reduction under § 3582(c)(1)(A)(i)."); United States v. Cantu, No. 1:05-CR-458-1, 2019 WL 2498923, at *5 (S.D. Tex. June 17, 2019) ("[W]hen a defendant brings a motion for a sentence reduction under the amended [§ 3582(c)(1)(A)], the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)–(C) warrant granting relief.").

Accordingly, the Court, in its discretion, may recognize the extraordinary and devastating effect the COVID-19 pandemic may have on Honnigford's safety, perhaps even his life—as an appropriate "extraordinary and compelling reason" for granting this motion. See Redd, 2020 WL 1248493, at *8 ("[A] court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) . . . .").

### III.  PROCEDURAL HISTORY and SUMMARY of ARGUMENTS

On or about April 17th, 2020, Honnigford filed his Petition for Post-Conviction relief pursuant to 28 U.S.C. 2241. In his petition, Honnigford requests that the Court enter an Order granting his request for immediate release into home confinement based principally upon his satisfaction of United States Attorney General William Barr's March 26, 2020 and April 3, 2020 Memorandums prioritizing home confinement criteria in response to the current COVID19 pandemic.

As this Honorable Court well knows, it is generally required that federally incarcerated inmates who file and seek adjudication of a section 2241 petition, first establish that he/she has fully satisfied the Federal Bureau of Prison's Administrative Remedy system exhaustion requirements. Based upon the emergent and exigent circumstances that exist herein, Honnigford respectfully requests that the Court exercise its equitable authority and waive the otherwise generally required exhaustion requirement. See United States v Perez, (SDNY, 17-cr-513)

Honnigford additionally, respectfully requests that the Court enter an order shortening the typical motion "briefing schedule," based upon the exigencies at hand herein. More specifically, Honnigford respectfully requests that the Court direct the Respondent to file his

6

response herein within 7 days of his receipt of Honnigford's Petition and attendant filings and to then direct that Honnigford shall file his reply thereto within 7 days from the date of his receipt of the response.

Honnigford attaches his sworn declaration, and the declaration of his mother, Clara Louise, pursuant to 28 USC section 1746, which detail and delineate the substantive issues and challenges confronting Honnigford within the Federal BOP facilities, as well as his reentry and quarantine plan for release which will not put himself or others at increased risk for contracting the virus. All statements in his sworn declaration support his request for emergency relief.

## IV. THE REQUIREMENT to EXHAUST ADMINISTRATIVE REMEDIES SHOULD BE WAIVED

The Court should hold that—under these extreme circumstances—the exhaustion requirement in § 28 U.S.C. section 2241 is waived. First, forcing Honnigford to endure a lengthy administrative appeal serves no purpose. The sole purpose of the exhaustion requirement in § U.S.C. section 2241 is to provide the BOP the opportunity to determine whether there are extraordinary and compelling circumstances. Here, the Court's discretion to find that the COVID-19 pandemic constitutes an "extraordinary and compelling reason" justifying relief precludes the need for such a determination from the BOP. Moreover, the Court need only look at the position the BOP has taken in other compassionate release cases related to the COVID-19 pandemic to realize that the BOP would likely reject Honnigford's request. See, e.g., United States v. Gileno, No. 3:19-CR-161-VAB, 2020 WL 1307108, at *3 (Mar. 19, 2020) (noting that the government opposed defendant's motion because the BOP "has developed an extensive action plan . . . to address the COVID-19 pandemic").

7

Second, the Court's exercise of jurisdiction here would not infringe on the BOP's jurisdiction given the unprecedented and deadly risks COVID-19 poses to Honnigford. Even in the context of federal habeas proceedings, where the exhaustion doctrine is a matter of federalism and comity, courts nevertheless may dispense with the requirement in cases in which "exceptional circumstances of peculiar urgency are shown." Hendricks v. Zenon, 993 F.2d 664, 672 (9th Cir. 1993) (quoting Granberry v. Greer, 481 U.S. 129, 134 (1987)). Permitting waiver of exhaustion under § U.S.C. section 2241 is arguably even more appropriate than in the habeas context because federalism is not implicated in compassionate release as it is in habeas proceedings. See Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484, 490-91 (1973) (noting that in habeas proceedings, the exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings).

Third, a deferral to permit the BOP to make its determination and any subsequent administrative appeal is unworkable given the never-before-in-our-lifetime health crisis which the entire world is confronting with the COVID-19 pandemic. For the Court to wait thirty days before determining whether the COVID-19 pandemic presents sufficiently extraordinary and compelling circumstances for Honnigford to be released to home detention would be counterproductive, inefficient, and would subject Honnigford to a significant risk of severe illness or death.

8

## V.  ARGUMENT

Extraordinary and Compelling Reasons Warrant a transfer of Honnigford from federal

prison to home confinement, pursuant to the Attorney General's April 3, 2020 Memorandum.

Courts around the nation are recognizing the risk COVID-19 poses to the vulnerable

inmate population and are granting appropriate relief. For example, a court in the District of

Nevada modified terms of intermittent confinement due to COVID-19. See United States v.

Barkman, No. 19-CR-52 (RCJ) (D. Nev. Mar. 22, 2020) (D.E. 21). Similarly, a court in the

Northern District of California recently granted a defendant's motion for reconsideration

regarding his release pending extradition to Peru. See In the Matter of the Extradition of

Alejandro Toledo Manrique, No. 19- mj-71055-MAG-1, 2020 WL 1307109 (N.D. Cal. Mar. 19,

2020). The court began its analysis by recognizing these "extraordinary time[s]" and the

measures being taken by local and national governments to contain the COVID-19 pandemic. Id.

at *1. Although the jail where the defendant was confined had prepared a plan to manage the

COVID-19 pandemic, the court noted that the jail was not testing inmates; waiting for the first

confirmed case of COVID-19 could be too late for the elderly defendant. Id. Further, even

though the court recognized that the defendant posed a flight risk, the court imposed several

conditions to mitigate that risk and ordered the defendant to be released. Id. at *2.

In another example, a court in the Southern District of New York granted a defendant's

emergency motion for reconsideration of denial of bail and ordered the defendant released with

conditions. See United States v. Stephens, No. 15-cr-95, 2020 WL 1295155, at *2 (S.D.N.Y.

Mar. 19, 2020). The court noted that, since the initial bail hearing, "the unprecedented and

extraordinarily dangerous nature of the COVID-19 pandemic has become apparent" and that

while "there is not yet a known outbreak among the jail and prison populations, inmates may be

at a heightened risk of contracting COVID-19 should an outbreak develop." Id. (citing Joseph A. Bick, Infection Control in Jails and Prisons, 45 Clinical Infectious Diseases 1047, 1047 (Oct. 2007)).

While a release to home confinement constitutes an extraordinary request, the action is warranted, given the unique circumstances currently being experienced nationwide. Understanding the gravity of the pandemic and the fatal consequences of inaction, courts are extending extraordinary relief. See Xochihua-James v. Barr, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (sua sponte releasing detainee from immigration detention "in light of the rapidly escalating public health crisis"); United States v. Perez, ECF No. 62, Case No. 1:19-cr-297 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19"); United States v. Stephens, ECF No. 2798, Case No. 15-cr-95 (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic"); In re Manrigue, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail."); In re Request to Commute or Suspend County Jail Sentences, Docket No. 084230 (N.J. Mar. 22, 2020) (releasing large class of defendants serving time in county jail "in light of the Public Health Emergency" caused by COVID-19); see also United States v. Matthaei, ECF No. 30, Case No. 1:19-cr-243-BLW (D. Idaho Mar. 16, 2020) (extending self-surrender date by 90 days in light of COVID-19); United States v. Barkman, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkman . . . is admitted to the inmate population of the Wahoe County Detention Facility"). Extraordinary times require atypical actions.

Accordingly, the Court should find that the COVID-19 pandemic – and the threats such pandemic poses on Honnigford's life – constitutes an "extraordinary and compelling reason" under § 3582(c)(1)(A)(i) to justify a release to home confinement.

## VI.  THE §3553(a) FACTORS WEIGH in FAVOR of TRANSFERRING from FEDERAL PRISON to HOME CONFINEMENT

In determining whether the Bureau of Prisons should transfer from prison to home confinement, the Court may consider factors under §3553(a). Honnigford does not present a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g). U.S.S.G § 1B1.13 (2). Since he does not, the Court may look to the factors outlined in 18 U.S.C. § 3553(a), which include: "the nature and circumstances of the offense and the history and characteristics of the defendant; the purpose of sentencing; the kinds of sentences available; the sentences and ranges established by the Sentencing Guidelines; relevant policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentencing disparities among similarly situated defendants; and the need to provide restitution to victims." United States v. Trujillo, 713 F.3d 1003, 1008 (9th Cir. 2013).

Honnigford has no history of violence and poses no danger to the community. Additionally, he had no previous criminal history prior to his Possessing Sexually Explicit Material Involving Minor relates offense, which was nonviolent. The remaining factors militate in favor of relief here. Honnigford has accepted responsibility, and a sentence of home confinement would not diminish the severity of the offense, while allowing Honnigford to serve the remainder of his term in the safety of his mother's home.

## VII.  RELEASE PLAN

If the Court grants Honnigford's request, he will live at his mother's home with his

mother, Clara Louise Honnigford, at 665 South Boeke Road, Evansville, IN  47714. See

declaration of Clara Louise Honnigford, attached here too. Clara Louise was previously

approved for supervision of Honnigford by the U.S. Probation Office as part of his compliance

with applicable pre-trial release provisions. Prior to home confinement with his mother at the

address listed above, Honnigford's wife would transport Honnigford from FCI Elkton in Lisbon,

OH to their previous home address on file with the U.S. Probation Office in Evansville, IN for

the purposes of mutual self-quarantine in accordance with the recommendations from the Center

for Disease Control. Honnigford's risk of COVID-19 transmission is significantly reduced if he

were to transfer to live with his mother, in a single-family residence. It is far safer than if he were

to remain confined in a facility containing more than 2,417 inmates, plus BOP support staff,

where there is the potential for people carrying the Coronavirus.

Further, Honnigford would be residing near a physician capable of rendering immediate

care in the even that it is necessary. It is undisputed that the conditions under which Honnigford

would be confined upon release would present a lower risk of contracting COVID-19 than he

faces in his current BOP facility.

Honnigford will have health and dental insurance immediately upon his release in the

event that the Bureau of Prisons transfers him to home confinement. His wife and his mother will

provide necessary financial support throughout the home confinement period. Honnigford will

only be permitted to leave the confines of the residence to seek medical care for his chronic

disorders. The Court may also impose additional restrictions such as electronic monitoring,

which Honnigford will pay for at his own expense.

## VIII. <u>CONCLUSION</u>

For all the foregoing reasons, Honnigford respectfully requests that the Court order the

Bureau of Prisons to transfer him to home confinement so that he can conclude his sentence

while lessening his risk of being exposed to the Coronavirus.

Dated: April 17th, 2020

RESPECTFULLY SUBMITTED,

John P. Honnigford   # 15765-028
Pro se Petitioner
FCI Elkton Correctional Institution

13